FILED

2008 Mar-17  PM 01:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| | } | |
| **FELICIA MITCHELL, o/b/o E.M.M.,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **CASE NO. CV 06-B-1428-S** |
| | } | |
| **Michael J. ASTRUE,**[1] | } | |
| **Commissioner, Social Security** | } | |
| **Administration,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

_____Felicia Mitchell, on behalf of her daughter, E.M.M., brings this action seeking review of the final decision by the Commissioner of Social Security ("Commissioner") to deny E.M.M.'s application for Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act. 42 U.S.C. § 405(g) (2000). Upon review of the record, the submissions of the parties, and the relevant law, the court is of the opinion that the Commissioner's decision is due to be affirmed.

## I. STANDARD OF REVIEW

This court has a narrow role in reviewing claims brought under the Social Security Act and is limited to determining whether the Commissioner's decision is supported by

---

[1] Michael J. Astrue became the Commissioner of Social Security on February 12, 2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue is substituted for Jo Anne B. Barnhart as the defendant in this suit by operation of law.

substantial evidence and whether the proper legal standards were applied. *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983). Although the court may not decide facts, re-weigh evidence or substitute its judgment for that of the Commissioner, *see Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983), this limited scope of review does not render affirmance automatic: "'despite [this] deferential standard for the review of claims . . . [the] Court must scrutinize [the] record in its entirety to determine reasonableness of decision reached.'" *Lamb*, 847 F.2d at 701 (citation omitted). The Commissioner, as the trier of facts, determines the credibility of witnesses and the resolution of conflicting statements and testimony. *Bloodsworth*, 703 F.2d at 1242.

The burden is on the claimant to prove disability. *Kirkland v. Weinberger*, 481 F.2d 46, 48 (5th Cir. 1973). The claimant's "burden is a heavy one, so stringent that it has been described as bordering on the unrealistic." *Oldham v. Schweiker*, 660 F.2d 1078, 1083 (5th Cir. 1981) (citations omitted). Even if the evidence preponderates against the Commissioner's decision, the court must affirm if the decision is supported by substantial evidence. *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Bloodsworth*, 703 F.2d at 1239. Substantial evidence is defined as more than a scintilla, but less than a preponderance. *Bloodsworth*, 703 F.2d at 1239. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion. *Id.*

## II. PROCEDURAL HISTORY

On October 25, 2004, Felicia Mitchell protectively filed an application for child SSI benefits on behalf of E.M.M., alleging that E.M.M.'s disability began on October 22, 2004. (R. at 42-47.)[2] Following an administrative denial of SSI benefits, a request for a hearing before an administrative law judge ("ALJ") was timely filed. (R. at 19, 25.) The ALJ conducted the hearing with E.M.M. represented by counsel on January 24, 2006, and issued a decision on April 10, 2006, finding E.M.M. not disabled within the meaning of the Social Security Act. (R. at 11, 18.) The Appeals Council subsequently denied E.M.M.'s request for review on May 25, 2006, making the ALJ's decision the final decision of the Commissioner. (R. at 4–7.) Having exhausted her administrative appeals, E.M.M. instituted the present action against the Commissioner on February 16, 2007. (Doc. 8.)[3]

## III. FACTUAL SUMMARY

E.M.M. was born on April 23, 1995, so she was nine years old on the date of her alleged onset of disability and ten years old on the date of the ALJ's decision. (R. at 12.) She was diagnosed with attention deficit hyperactivity disorder ("ADHD") in February

---

[2] The reference format, ["R. at ___"], refers to page numbers as they appear in the certified copy of the transcript of the administrative record, filed with the court by the Commissioner in accordance with 42 U.S.C. § 405(g).

[3] Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's case docket.

2004 and with anxiety disorder in May 2005. (R. at 12, 191–94.) The "function report"[4] that E.M.M.'s mother filled out in November 2004 in conjunction with E.M.M.'s SSI application describes E.M.M. as having several functional limitations in learning,[5] communicating with others, and the ability to complete tasks. (R. at 49–56.) On a separate function report a month later, E.M.M.'s mother explained that E.M.M. has trouble paying attention, completing tasks, and following instructions. (R. at 66.) E.M.M.'s mother provided an updated function report on March 14, 2005, and confirmed the continuation of the same issues from the original report (R. at 67–75); however, E.M.M.'s mother also noted that E.M.M.'s medication for ADHD "is working." (R. at 82.)

 E.M.M. underwent sleep studies in April 2004 because of complaints about being tired at school leading to poor grade performance. (R. at 150–59.) The results showed normal sleep activity. (R. at 152.) An examination by E.M.M.'s treating physician at Children's Hospital on November 9, 2004, indicated that E.M.M.'s school performance suffered when she was not taking her ADHD medication. (R. at 174.) Otherwise the physician found her to be a "well child" whose prognosis was excellent. (R. at 174–75.) Following the administrative denial of E.M.M.'s SSI claim, E.M.M. began hallucinating

---

[4] The "Function Report – Child" is a form provided by the Disability Determination Service that asks the claimant a series of questions about the child's physical, mental, and behavioral limitations, with boxes to check "yes" or "no" and spaces for the claimant to comment.

[5] E.M.M.'s mother added a note on this report explaining that E.M.M. was in a special education class because she had tested on a second grade level.  (R. at 52.)

and having delusions after witnessing her grandmother's death in March 2005. (R. at 191–92.) She was hospitalized for one week in the psychiatric unit of Montclair Hospital for what her mother called a "nervous breakdown." (R. at 193.) E.M.M. also had double pneumonia while in the hospital. (R. at 207.)

After her hospitalization, E.M.M. began counseling and treatment at Gateway Counseling Clinic. (R. at 192.) On April 13, 2005, a therapist at Gateway noted E.M.M.'s condition as "withdrawn" with lethargic psychomotor activity and decreased energy level. (R. at 202–03.) The therapist also noted E.M.M.'s visual and auditory hallucinations because E.M.M. described seeing lions and sheep that were "coming after her," as well as hearing voices. (R. at 203.) On April 19, 2005, E.M.M. received an initial diagnosis of posttraumatic stress disorder ("PTSD"), in addition to the already-diagnosed ADHD. (R. at 200.) Her first Global Assessment of Functioning ("GAF") score on this date was 40. (R. at 200.)

E.M.M. received a psychological evaluation on May 12, 2005, from Dr. Caroline Baker, a psychologist at Gateway Counseling Clinic. (R. at 191–94.) E.M.M. denied having any auditory hallucinations, but admitted to seeing ghosts before going to the hospital. (R. at 192.) Dr. Baker issued a standardized behavioral assessment based on interviews with both E.M.M. and her mother. (R. at 193.) According to Dr. Baker's assessment, E.M.M.'s mother's responses "endorsed a significant level of atypicality, attention problems and adaptability. [E.M.M.] may have the tendency to behave in ways

5

that are immature or considered odd. She is likely easily distracted and unable to concentrate more than momentarily." (R. at 193.) E.M.M.'s responses, on the other hand, did not show any "at risk" or clinically significant behavioral problems. (R. at 193.) Moreover, E.M.M. scored a 34 on the Reynold's Child Depression Scale, a score which did not indicate possible depression. (R. at 193.) E.M.M. also scored a 60 on a GAF test rendered during this evaluation, a score that indicated moderate symptoms or moderate difficulty in social, occupational, or school functioning. (R. at 12,  n.1, citing *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994).)

Dr. Baker further found that E.M.M. exhibited an extreme defensiveness and "apparent need to present as 'perfect,'" which interfered with the clarity of Dr. Baker's assessments of  E.M.M. (R. at 193.) Dr. Baker concluded, however, that E.M.M. demonstrated "a restricted affect and emotional numbing but does not meet criteria for a diagnosis of PTSD." (R. at 193–94.) Dr. Baker diagnosed E.M.M. with anxiety disorder and trichotillomania, a condition in which a patient has an urge to pull out his or her own hair, and recommended that E.M.M. see a pediatric psychiatrist who could decide whether medication could improve E.M.M.'s condition. (R. at 194.) A Gateway psychiatrist did, in fact, prescribe Prozac for depression in addition to E.M.M.'s ADHD medication. (R. at 195.)

Subsequent treatments at Gateway in July 2005 showed that E.M.M. was able to

6

share her grief about her grandmother's death and that her functioning level had "improved significantly." (R. at 184.) The therapist also reported that E.M.M.'s sleeping and appetite had improved, her signs of depression had decreased, and her hallucinations had stopped. (R. at 185.) E.M.M. was given an intelligence test by Dr. Baker in September 2005, which showed that E.M.M. had an average ability to sustain attention, concentrate, and exert mental control. (R. at 212.) E.M.M.'s mother terminated treatment at Gateway in December 2005, saying that E.M.M. "seems to be doing well" and was not showing signs of distress. (R. at 209.) The therapist noted that E.M.M. had made moderate progress with her depression and significant progress with her anxiety. (R. at 209.) E.M.M.'s final GAF score was 74. (R. at 210.) A GAF of 74 indicates that symptoms have no more than a slight impairment in social, occupational, or school functioning. (R. at 12, n.2, citing *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994).)

E.M.M. has been in special education classes at school since January 2004. (R. at 85.) A disability determination questionnaire completed by E.M.M.'s fourth grade teacher in December 2004 showed that E.M.M. had mostly "serious" and "very serious" problems in the acquiring and using information domain, ratings that corresponded to numerical values of "4" and "5," respectively, on a five-point scale. (R. at 89.) In the domain of attending and completing tasks, the teacher gave E.M.M. the lowest two ratings, "no problem" or "a slight problem," in the various categories, and marked the middle rating,

7

"an obvious problem," only in the area of "carrying out multi-step instructions." (R. at 90.) No problems were observed in interacting and relating with others, moving about and manipulating objects, or caring for oneself. (R. at 91–94.) Under medical conditions/health and physical well-being, the teacher noted that E.M.M. takes medication and that E.M.M.'s functioning changes after taking the medication. (R. at 95.) E.M.M.'s grades in fourth grade were A's and B's, with only two C's as quarterly grades in reading and math. (R. at 223.)

An Individualized Education Program ("IEP") was created for E.M.M. by school officials when E.M.M. was in the fourth grade, identifying educational services that E.M.M. would need during the school year. (R. at 231.) The IEP noted that E.M.M. would receive special education instruction only for math and spelling, since her reading ability had improved dramatically. (R. at 231.)  The IEP also reported E.M.M.'s teacher's observations, that E.M.M. attempts to complete all work requested but often needs more time than other students, that E.M.M. enjoys cooperative work, and that E.M.M. gets along well with peers and teachers but sometimes becomes "sulky." (R. at 231.)

E.M.M.'s fifth grade teacher reported that E.M.M. continued to have serious problems in acquiring and using information. (R. at 141.) In the attending and completing tasks domain, the teacher indicated that E.M.M. had either "no problem" or "a slight problem" in the categories comprising this domain. (R. at 142.) The teacher reported mostly "no problem" or "a slight problem" in the interacting and relating to others

domain, although E.M.M. exhibited "an obvious problem" in using language appropriate to the situation and listener. (R. at 143.) There were no problems in moving about and manipulating objects or caring for oneself, and E.M.M.'s medical conditions were the same as those reported by the fourth grade teacher. (R. at 144–46.) E.M.M.'s grades during the first semester of fifth grade declined to C's and D's. (R. at 219.)

At the hearing before the ALJ in January 2006, E.M.M.'s mother testified that her daughter no longer receives treatment for anxiety and depression because her primary care doctor has not found an outpatient center yet. (R. at 260.) E.M.M.'s mother said that she would continue to take E.M.M. to Gateway. (R. at 261.) E.M.M's mother also reported that E.M.M. continues to have difficulty sleeping at night and interacting with other children at school, and that E.M.M. continues to hallucinate about every night. (R. at 261, 265.) E.M.M.'s mother did report improvement when E.M.M. takes her ADHD medication, but she noted that E.M.M. still has problems in concentration. (R. at 262–63.) In addition, E.M.M.'s mother testified that E.M.M. never finishes tests, chores or anything else she is given to do, and that E.M.M. is always wandering. (R. at 263.) According to E.M.M.'s mother, E.M.M. falls asleep at school about twice a week, does not have any friends, spends time alone, cries about three times a week, and wets the bed about every other day. (R. at 263–64.) Finally, E.M.M.'s mother said E.M.M. beats her head up against the wall or tries to stick a pencil in her hand when she gets frustrated. (R. at 265.)

## IV. DISCUSSION

### A. Eligibility for Child SSI Benefits

The standard for evaluating a child's disability[6] includes a three-step analysis to determine eligibility for SSI benefits. *See* 20 C.F.R. § 416.924(a) (2006). First, the ALJ must find that the claimant is not engaged in "substantial gainful activity" or certain work activities. *See id.*; *see also* 20 C.F.R. § 416.972 (2007). Next, the ALJ must consider whether each medically determinable physical or mental impairment is "severe." *See* 20 C.F.R. § 416.924(a). Finally, if the impairment is severe, the ALJ must determine whether

---

[6] "Disability" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . ."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (2000).

The Personal Responsibility and Work Opportunity Reconciliation Act of 1996 altered the standard by which children are eligible for SSI benefits. *See, e.g.*, *Wilson v. Apfel*, 179 F.3d 1276, 1277–78, 1277 n.1 (11th Cir. 1999) (finding that the new legislation "tightens rather than expands the definition of 'disabled' with respect to children under 18, with the result that any child considered not disabled under the old law is necessarily considered not disabled under the new law"). Previously, children could be eligible for benefits upon a showing of a medically determinable physical or mental impairment of "comparable severity" to an impairment that would disable an adult; the new statute, however, eliminated this option, requiring a child claimant to show that the impairment results in "marked and severe functional limitations."  *See* 42 U.S.C. § 1382c(a)(3)(A) (1992), *amended by* 42 U.S.C. § 1382c(a)(3)(C)(i) (1997)); *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1997).

Thus, the following is the current standard for showing a child's disability:

> [a]n individual under the age of 18 shall be considered disabled for the purposes of this subchapter if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 1382c(a)(C)(3)(i) (2004).

the impairment "meets, medically equals, or functionally equals the listings," *see id.*, and whether the impairment has lasted or is expected to last for a continuous period of at least twelve months, *see id.*; 42 U.S.C. § 1382c(a)(3)(C)(I) (2004).

This third step initially requires a comparison of each impairment at issue with those that the ALJ considers "severe enough to prevent an individual from doing any gainful activity . . . ." *See* 20 C.F.R. § 416.925(a) (2006). If the impairment does not exactly match the criteria for a listed impairment, the ALJ will determine whether the impairment "medically equals" a listed impairment, that is, whether "it is at least equal in severity and duration to the criteria of any listed impairment." *See* 20 C.F.R. § 416.926(a) (2006). Finally, the ALJ can determine that an impairment "functionally equals" the listings by showing that the impairment results in either "marked" limitations in two of six "domains of functioning" or an "extreme" limitation in one of six domains. *See* 20 C.F.R. § 416.926a(a) (2006). The six domains of functioning are:

1) acquiring and using information;
2) attending and completing tasks;
3) interacting and relating with others;
4) moving about and manipulating objects;
5) caring for yourself; and
6) health and physical well-being.

*Id.* § 416.926a(b)(1). A "marked" limitation means that the impairment interferes "seriously" with the claimant's ability to independently initiate, sustain, or complete activities. *See id.* § 416.926a(e)(2). An "extreme" limitation occurs when the impairment interferes "very seriously" with the claimant's same abilities. *See id.* § 416.926a(e)(3).

11

When examining functional equivalence in these six domains, the Social Security Administration regulations require the ALJ to assess the "interactive and cumulative effects" of all the impairments for which there is evidence, including impairments that are not severe. *See id.* § 416.926a(a). The ALJ must consider a variety of factors unique to the claimant's situation and ask for specific information relevant to predetermined questions such as those that measure the claimant's ability to initiate and complete tasks, need for help, ability comparable to peers, impact of illnesses and effect of treatment, and functioning ability in various settings. *See* 20 C.F.R. §§ 416.926a(b)(2); 416.924a (2006); 416.924b (2006); 416.929 (2006).

## B. Decision of the ALJ

Because E.M.M. was ten years old and attended school at the time of the hearing, the ALJ determined that E.M.M. had not engaged in substantial gainful activity. (R. at 14.) The ALJ also concluded based on record evidence that E.M.M.'s ADHD and anxiety disorder qualified as severe medical impairments that had continuously lasted for at least twelve months. (R. at 14.) However, the ALJ found that E.M.M.'s impairments did not meet, medically equal, or functionally equal a listing set forth in the SSA's listing of impairments because E.M.M. did not contend as such and because no medical evidence supported that conclusion. (R. at 15.)

In deciding whether E.M.M.'s impairments functionally equaled a listing, the ALJ found that E.M.M. had a marked limitation in acquiring and using information,

12

considering all the medical and educational evidence as well as the testimony of

E.M.M.'s mother. (R. at 16.) The ALJ determined that E.M.M. had a "less than marked"

limitation in attending and completing tasks by considering the assessments of E.M.M.'s

fourth and fifth grade teachers, who reported only one obvious problem and no serious

problems in this domain. (R. at 16.) The ALJ also factored in medical evidence showing

that E.M.M.'s ADHD was controlled with medication and that E.M.M. scored in the

average range in ability to sustain attention and concentration on an intelligence test

administered by a psychologist. (R. at 16.) The ALJ also considered E.M.M.'s mother's

testimony that E.M.M. has trouble maintaining attention and does not finish tasks. (R. at

16.)

      In the domain of interacting with and relating to others, the ALJ contrasted the

mother's testimony that E.M.M. has no friends with E.M.M.'s teachers' assessments that

E.M.M. had only one obvious problem in this domain, that of using language appropriate

to the situation.  In addition, the ALJ considered E.M.M.'s IEP, which documented

E.M.M.'s fourth grade teacher's comments that E.M.M. was cooperative and generally

got along well with teachers and peers. (R. at 16.) Although the ALJ did not mention any

medical evidence in evaluating E.M.M.'s ability to interact with and relate to others, the

ALJ decided from the other evidence that E.M.M. had a "less than marked" limitation in

this domain. (R. at 16.) The ALJ further relied on medical evidence, educational

evidence, and testimony from the mother to determine that E.M.M. had no limitations in

the domains of moving about and manipulating objects, caring for herself, and health and physical well-being. (R. at 17.)

Because the ALJ determined that E.M.M. had a marked limitation in only one of the six domains, the ALJ concluded that E.M.M.'s impairment did not functionally equal a medical listing. (R. at 17.) As a result, E.M.M.'s severe impairments did not meet the third step of the disability analysis, requiring the ALJ to decide that E.M.M. was not disabled under the Social Security Act and should not receive SSI benefits. (R. at 17–18.)

## C. E.M.M.'s Arguments for Reversal and Remand

### 1.    The ALJ Did Not Err by Failing to Express the Amount of Weight Given to Specific Portions of a Psychological Evaluation of E.M.M.

E.M.M. argues that the ALJ failed to consider the May 2005 opinion and psychological evaluation of Dr. Baker, who diagnosed E.M.M. with anxiety disorder and trichotillomania. (Doc. 8 at 6.) E.M.M. specifically asserts that the ALJ neither mentioned Dr. Baker's evaluation nor stated the amount of weight given to it. (Doc. 8 at 6.) E.M.M. alleges that as a result of this omission, the ALJ's decision was not based on substantial evidence; moreover, E.M.M. argues that if the ALJ had considered this evidence, the ALJ would have found a marked or severe limitation in the domains of attending and completing tasks and interacting and relating with others, leading to a finding of functional equivalence to a listed impairment. (Doc. 8 at 5–6.)

Although the ALJ has a duty to investigate the facts and develop arguments for and against granting benefits, *Sims v. Apfel*, 530 U.S. 103, 111 (2000), the ALJ is not

14

required to expressly refer to every piece of evidence in his decision as long as any omission is not a broad rejection that prevents the court from reviewing the claimant's medical condition as a whole, *see Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005); *Powell v. Astrue*, 250 F. App'x 960, 965 (11th Cir. 2007). Nonetheless, the review must take into account and evaluate the record as a whole. *McCruter v. Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986). Additionally, the ALJ is required to make clear the weight accorded to each item of evidence and why he reached that decision. *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981).

E.M.M. relies on *Cowart* by claiming that the ALJ did not specifically state the weight given to Dr. Baker's evaluation, thus preventing the ALJ's decision from being based on substantial evidence. (Doc. 8 at 6–7.) However, the court in *Cowart* was objecting to a single blanket statement by an ALJ, asserting only that the ALJ had "carefully considered all of the testimony . . . and exhibits . . . and [had] given weight to each as he feels should be properly accorded to it." 662 F.2d at 735.

In this case, the ALJ explicitly acknowledged Dr. Baker's evaluation and diagnosis of E.M.M. and determined that E.M.M.'s psychological assessments at Gateway (which included Dr. Baker's evaluation) are "consistent with" other psychological treatment through Children's Hospital and are not "contradicted by any substantial evidence." (R. at 15.) In fact, the ALJ gave "significant weight" to these psychological records. (R. at 15.) Moreover, the ALJ expressly referred to the Gateway tests conducted by Dr. Baker in

15

September 2005 that found E.M.M.'s ability "to sustain attention and concentration" in the average range. (R. at 16.) Although the ALJ did not expressly refer to Dr. Baker's notations in May 2005 that E.M.M. is "likely easily distracted and unable to concentrate more than momentarily" (R. at 193), the ALJ had already referred to this evaluation and accorded it significant weight.

Because the ALJ had considered the May 2005 evidence from Dr. Baker in the decision and referred to a later evaluation by Dr. Baker that assessed E.M.M. in the domain of attending and completing tasks, the ALJ did not fail to consider the psychological evaluation of Dr. Baker in this domain. Unlike the ALJ in *Cowart*, the ALJ here gave no vague blanket statement about the weight of the evidence, but instead stated very specifically the weight given to E.M.M.'s psychological records, which included Dr. Baker's evaluations. The ALJ might not have directly referred to each assessment by Dr. Baker, but the decision did not broadly reject evidence in such a way that the court is prevented from reviewing the claimant's condition as a whole.

In addition, even if the ALJ had included statements from Dr. Baker's May 2005 evaluation regarding E.M.M.'s concentration level, it is unlikely that the statements would demonstrate a marked limitation that seriously interferes with the E.M.M.'s ability to initiate, sustain, or complete activities. The full May 2005 evaluation from Dr. Baker showed that E.M.M. did not possess any "at-risk" or "clinically significant" behavioral problems, although Dr. Baker admittedly did not have ideal diagnostic clarity.

16

Nonetheless, it is not for this court to re-weigh the evidence, but merely to ensure that substantial evidence supports the ALJ's decision.

In assessing E.M.M.'s limitations in the domain of interacting and relating with others, the ALJ did not expressly mention Dr. Baker's May 2005 evaluation, which said that E.M.M. might behave oddly and have difficulty adapting to changes in the environment. (R. at 193.) Again, however, the ALJ has already afforded this evaluation significant weight and is not required to make specific references to assessments within it. Furthermore, later psychological evaluations at Gateway showed that E.M.M. had made significant improvements in dealing with her anxiety disorder and in interacting with others. Upon her discharge from Gateway in December 2005, E.M.M. was evaluated as having made moderate progress with her depression and significant progress with her anxiety, and her mother reportedly said E.M.M. "seems to be doing well." Therefore, even if Dr. Baker's May 2005 assessments had been specifically referenced, it appears that there is substantial other evidence supporting the ALJ's decision that E.M.M. did not have a marked limitation in interacting and relating to others.

E.M.M. has failed to establish that the ALJ did not rely on substantial evidence by omitting certain aspects of a single evaluation by Dr. Baker. Because the ALJ considered, weighed, and mentioned this psychological evaluation, among other medical evidence, the ALJ adequately considered the evidence as a whole and did not fail to develop and investigate arguments supporting a grant of SSI benefits. Therefore, the ALJ relied on

substantial evidence sufficient to affirm the Commissioner's decision.

### 2.   The ALJ Did Not Err in Evaluating the Evidence from E.M.M.'s Mother and Teachers

E.M.M. argues that testimony and evidence from E.M.M.'s mother and evidence from E.M.M.'s teachers showed that E.M.M. has a marked or extreme limitation in attending and completing tasks and in interacting and relating with others. (Doc. 8 at 5–6.) The Social Security regulations determining child disability include age-specific guidelines for assessing whether a claimant has a marked or extreme limitation in the six domains. *See* 20 C.F.R. § 416.926a(g)–(l). In the attending and completing tasks domain, school-age children[7] should be able to follow directions, remember and organize school materials, complete assignments, change activities without distractions, and stay on task when appropriate. *Id.* § 416.926a(h)(2)(iv). In assessing functional abilities, the ALJ will review and obtain evidence from sources such as parents and teachers, in addition to medical sources. *See id.* § 416.926a(b)(3). A claimant's testimony can be rejected on credibility grounds, but the ALJ must explicitly state such a rejection. *Owens v. Heckler*, 748 F.2d 1511, 1514 (11th Cir. 1984). Once the ALJ determines the credibility of witnesses and resolves any conflicting statements and testimony, it is not for the court to reach an alternative conclusion unless the ALJ's decision is based on a lack of substantial evidence. *See Bloodsworth*, 703 F.2d at 1242.

---

[7] School-age children are defined as between the ages of six and twelve. 20 C.F.R. § 416.926a(h)(2)(iv).

In this instance, the ALJ repeatedly mentioned E.M.M.'s mother's testimony throughout the decision and followed each piece of the mother's testimony with contradictory evidence. For example, the ALJ states, "The mother testified that the claimant's counselor said the claimant was functioning on the level of 1st grade. The record fails to contain verification of this allegation by either a counselor at school or from Gateway or Children's Hospital."[8] (R. at 16.) These contradictions to the evidence in the record logically implicate a lack of credibility and make clear that the ALJ accorded E.M.M.'s mother's testimony little weight. Later in the decision, the ALJ discussed E.M.M.'s mother's testimony regarding E.M.M.'s lack of attention span and failure to complete tasks, and then followed that testimony with the assessments of teachers, counselors, and medical professionals, all of whom reported E.M.M. as having few problems in this domain. (R. at 16.) It is clear that the ALJ considered the testimony of E.M.M.'s mother but found it contradictory to or outweighed by the other record evidence. Furthermore, the ALJ clearly states in the decision's final findings that "[t]he subjective allegations of the claimant's mother are not fully credible." (R. at 18.)

E.M.M.'s claims that the opinions of her teachers support a marked or extreme limitation in attending and completing tasks are misplaced. The ALJ gave the evidence from teachers "significant weight." (R. at 15.) The only evidence of any problems in this domain come from the fourth grade teacher who indicated that E.M.M. has "an obvious

---

[8] The ALJ then describes specific assessments by E.M.M.'s teachers regarding her academic performance. (R. at 16.)

problem" in carrying out multi-step instructions. (R. at 90.) In the other twelve categories in this domain, the teacher found "no problem" or "slight problems." (R. at 90.) Likewise, the fifth grade teacher found "no problem" or "slight problems" in all thirteen categories. (R. at 142.) E.M.M. has therefore failed to show any substantial evidence from teachers demonstrating a marked limitation that seriously interferes with E.M.M.'s ability to initiate, sustain, or complete activities.

E.M.M. further argues that the ALJ did not properly consider the testimonial evidence from E.M.M.'s mother regarding E.M.M.'s lack of friends at school, difficulty in relating to children her own age, and episodes of crying and destructive behavior. (Doc. 8 at 3, 5.) In the domain of interacting and relating with others, school-age children should be able to develop lasting friendships with other children, work in groups, understand and tolerate differences, and talk to people of all ages. *See* 20 C.F.R. § 416.926a(i)(2)(iv).

The ALJ again contradicted E.M.M.'s mother's testimony that E.M.M. has no friends and does not interact with others with evidence that "[t]he 4th grade teacher, however, reported that the claimant had no problems in interacting and relating to other [sic] and her behavior was age-appropriate." (R. at 16.) The only evidence from E.M.M.'s teachers showing more than a slight problem with her interactions came from E.M.M.'s fifth grade teacher, who reported that E.M.M. had an "obvious problem" using language appropriate to the situation and listener. (R. at 143.) Because the ALJ considered the

mother's testimony and weighed it against the other evidence in evaluating this domain, the ALJ has scrupulously probed into the relevant facts and placed appropriate weight on each material item of evidence.

E.M.M. has not been able to prove that the ALJ failed to base the decision denying SSI benefits on such relevant evidence as a reasonable person would accept as adequate to support a conclusion. Instead, the ALJ adequately considered the evidence from E.M.M.'s mother and teachers, expressed the weight given to the evidence, and specifically impugned the credibility of E.M.M.'s mother's allegations. Even if the court disagreed with the weight placed on this evidence, it must affirm the decision of an ALJ who shows a reasonable basis for his decision and who supports that decision with substantial evidence.

**D. Other Arguments**

The ALJ must scrupulously and conscientiously probe into and explore all relevant facts in a case. *Cowart*, 662 F.2d at 735. The ALJ considered the mother's testimony, reports from teachers, and medical records to determine that E.M.M. had no limitations in the domain of health and physical well-being. (R. at 17.) Although the ALJ did not specify a weight given to this evidence, this issue is irrelevant because E.M.M. does not allege that the ALJ erred in the assessment of this domain. Additionally, the evidence shows no lasting non-psychological illnesses and conditions besides a one-week stay in the hospital, which was partially due to pneumonia. Because of these facts, any error

committed by the ALJ for not designating a weight to health and well-being evidence was harmless.

## V. CONCLUSION

The ALJ properly determined that E.M.M. had met the first two steps of the disability analysis but did not meet the third step, since E.M.M.'s severe impairments did not meet, medically equal, or functionally equal a listed impairment. In particular, the ALJ applied the appropriate legal standards and had substantial evidence supporting the decision that E.M.M. had neither a marked limitation in at least two of the six domains of functioning nor an extreme limitation in any one domain, and thus did not have impairments that functionally equaled the listings. As a result, upon consideration of the record as a whole, the submissions of the parties, and the relevant law, the court affirms the Commissioner's decision denying E.M.M. SSI benefits. An Order in accordance with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE** this 17th day of March, 2008.


SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE